We'll call the case in the United States of America v. Raymond Anthony Napolitan and in this matter there are cross-appeals but the panel has listed, or there's an appeal and cross-appeal, the panel has listed only the government's cross-appeal for purposes of oral argument. Mr. Kokas? By leaving the court, may I please have three minutes for rebuttal? Granted. Okay. May it please the court, A. U. S. A. Donovan Kokas on behalf of Cross-Appeal in the United States. In this case, in June of 2007, Raymond Napolitan lived in a small house here in Pittsburgh and in his small house he had a large gun safe containing a lot of guns. Two handguns, six shotguns, a bunch of rifles all locked in the safe. Another handgun was found atop the safe and yet another handgun, a loaded .32 Browning, was on a mantel in the front room of the house. I don't believe there were any pictures or any other forms of demonstrative evidence offered either at trial or time of sentencing to demonstrate the location of the one handgun on the mantel, was there? I think it was just live testimony, Your Honor. All right. Can you describe it somewhat for us because the distance between the safe and the gun seemed to have some impact on the sentencing judge here. So the loaded .32 Browning on the mantel was, according to the testimony of the officer, like three steps away from a desk in the next room which was festooned with cocaine residue and packaging paraphernalia scales. Within that room was a closet which contained the gun safe. And the house is about 1,000 square feet so we're talking about quite a small house. I'm sorry, go ahead. Okay. So Mr. Napolitan admitted that the guns were his. He admitted they were locked inside his gun safe. And where we parted paths a little bit was he refused to admit that also in the safe was his kilogram of cocaine and also in the safe was nine grand belonging to him from drug proceeds. Let me ask you what really I should have asked at the outset so that I'm clear on this. You had cited Drozdowski. Drozdowski. Drozdowski. Yes. And you've set out in your brief the factors and discussed those in length. I think it also spoke to the standard of review and are we here reviewing for clear error? I mean Drozdowski discussed a case where the review was essentially factual. In fact, Drozdowski was a Judge Becker opinion, wasn't he? I believe so. Yeah. So is this essentially factual what we have before us and are we reviewing for clear error? The short answer is yes, but to expand on it, the court's also being asked to review for legal error because in the course of denying our request for the 2D1.1 guideline enhancement, the district judge said I'm incorporating my Rule 29 comments. And in those Rule 29 comments, the district judge had stated at one point this guy has a Second Amendment right to have a gun that's registered to him in his own home. Heller doesn't say anything like that. Nothing since Heller has overruled 2D1.1 on Second Amendment grounds and 2D1.1 doesn't contain exemptions for defendants who have guns registered to them in their own home. Well, I think you focus too much on that one statement made by the sentencing court on the Rule 29 motion. I'd like you to talk about what's the legal standard here for the enhancement and how does the burden of proof get allocated? Sure, Your Honor. So when I was drafting my three-page response to your court's query, by the way, whoever found that issue, that was a great catch because I was unaware of the circuit split. But I backed up. Before I read the opinions, I asked myself, okay, what are we dealing with here? It's the preponderance of the evidence is the quantum of proof. Right. And that's your burden. I mean, you're asking for the enhancement. That's your burden. Right. So I asked myself, when the quantum of proof is a preponderance, can anyone ever be prejudiced? And the answer is yes, but in a very narrow circumstance. And that's only when the evidence is an exact equipoise. Only then will the misallocation of the burden of proof prejudice anyone. Because if the evidence preponderates one way or another, it doesn't matter who has the burden of proof. So then I asked, all right, if the evidence is an equipoise, can the government ever be prejudiced? And the answer is no, because as Judge Smith just said, the government always bears the burden by a preponderance. And therefore, the only person who can ever be prejudiced is the defendant by a misallocation. Because in that case, when the evidence is an equipoise, if you put the burden on him, the tide goes against him and he loses. And that shouldn't happen. So when I analyzed it this way, I thought to myself, of the two approaches, the minority approach in the Eighth Circuit and the majority approach in others, which one is more likely to create a situation where that very narrow circumstance could happen? The Eighth Circuit, on its surface, had an intuitive appeal, because it seems to say the government always has the burden of proof by a preponderance. But then it states that that burden is lowered in the case of this guideline. But isn't it possible for you as the government to have the burden of proof on the enhancement, but for the burden of production to shift to demonstrate what is effectively an exception? Absolutely, and that's what we're arguing, Your Honor, because when I read the Eighth Circuit case, and I read specifically the concurrence by Judge Corman and Anderson, he seemed to argue that by lowering the government's initial burden of proof, what you've really done is created a burden of proof in the defendant that shouldn't exist. And his argument's a little opaque, but it almost reminds me of like a conservation of mass energy type thing, where if you have a closed universe and you have mass... I hadn't quite thought that far along, but I thank you. Just don't expect that to work its way into an opinion. I'll be disappointed. But basically, if you move mass from one place, it's got to pop up somewhere else, and maybe it's that way with the burden of proof. If you lower our burden of proof, maybe that creates one in the defendant that didn't exist before. So when I thought of it like that, I didn't trust the Eighth Circuit anymore, and I trusted, at least on that issue... That won't make its way into the opinion either. But I did begin to trust more the overwhelming majority of circuits, which describe this as a burden of production shifting. This has considerable practical import in terms of how it unfolds in the courtroom, and that at least is my interest in it. But a broader issue here that may be helpful to district courts and the prosecutors and defense counsel, but a broader issue that I'd like you to engage us on here relates to your invocation of Drozdowski and the factors. And the question, though, as to whether or not we even need to get to the Drozdowski factors, the district court here never even mentioned the clearly improbable stand rate. Never mentioned it. Instead, his statement was that the guns were not certainly the type used by drug dealers. And that's just not right, is it? It's not. And it's not supported by the evidence, because our expert had testified that any gun that works will be used by drug dealers. And I backed off that a little bit with respect to black powder guns and things like that, but we still had lots of guns here. Other guns. Yes. A gun on the safe, a gun in the safe. And if I recall correctly, the district court really didn't even refer to those couple guns. In fact, we kept trying to remind the court of those guns, and the court then said, well, the gun that's referred to is the .32 Browning, and that's in a different room. But the problem is even if you just focused on the .32 Browning compared to the Drozdowski factors, it's loaded, it's readily accessible, it's within a few steps of the drug paraphernalia, within a few more steps of the safe full of drugs. To me, Drozdowski held the court properly applied the enhancement when all you had was a gun in the same house with paraphernalia. And keep in mind, these enhancements are not discretionary once the factors have been found that show they apply. If the factors apply, then the court must apply them. So is it your position that we should send this back to the district court to allow him to evaluate whether it is clearly improbable that the handguns were connected to a drug offense? Your Honor, again, I have to confess my position on this has changed over time. Before I recognized this circuit split on the burden shifting issue, I would have said no, send it back to the district court and make them apply the enhancement. But if this court is disposed to define a new burden shifting mechanism, as it sounds like it might be, then I think in fairness to the defendant, the thing to do would be to send it back to the district court, have this judge find that issue in the first instance. And as to the 3C1 enhancement, we have the same general issue, which is the district court essentially didn't apply the factors set forth by the Supreme Court You say that even when denying the obstruction of justice enhancement, the district court must make findings as to each element of the perjury claim? Yes, Your Honor. And I recognize that. We haven't held that, though. No, no. In fact, there is a circuit split on that issue as well. And I admit, I think three circuits go against me and two go for me. They all precede Booker, but the two that go for me, I think, anticipated Booker a little bit better, and especially cases like Greer. Of course, the government seems to have been perfectly satisfied with a jurisprudence that has not required much specific articulation from sentencing judges where the enhancement is actually imposed. But you're standing here suggesting that there should be specific articulation of reasons where not imposed.  The Supreme Court says the district court should engage in fact-finding whenever the defendant objects to the application of enhancement. But why isn't the district court's statement here, which was essentially in the alternative, and I'm trying to find the exact language, but what he said up front, the first thing he said was, I'm not sure the record supports this. Yes. Why isn't that enough? I mean, why isn't that enough, as a matter of fact, based on the current state of our jurisprudence? Well, I think Dunnegan's, and the cases that follow it, indicate clear factual findings. Now, maybe let's assume we read that as a blanket, maybe even tacit finding, that none of the Dunnegan factors has been met. But compare that to the evidence in this case, and you see clear error because Dunnegan asks, did the defendant lie? And in this case, he obviously did, because at Order 205 he says, I'm not a drug dealer. It's obviously material because the verdict convicts him of possession with intent to distribute. Just to state the obvious, and for the purposes of my recollection, Dunnegan does not compel specific findings that this enhancement applies, or that the perjury enhancement does not apply. It was a case where it did apply. It was a case where it did apply. So, again, an indication of the question being really open. So why do you think it's necessary for this particular enhancement when a district court judge denies the enhancement? Why should there be fact-finding here as opposed to others? Or do you think for all Chapter 3 enhancements, whether or not it's applied or not applied, there should be reasons given? I wouldn't go as far as to say the latter. The only reason I say that I think it should apply when the government asks for the enhancement and the court denies it is just the language that Dunnegan himself says when the enhancement is requested and the defendant objects, then the district court should make findings. That's what happened here. Now, I understand it then goes on to say if the court is going to apply the enhancement. But it seems to me if the obligation is triggered by the defendant's objection, that is antecedent to any ruling the court makes. Isn't the very nature of this enhancement such that the test ought to be a very compelling and discerning one requiring the district court to make factual findings? I mean, let's even take into account the history of perjury, the history of perjury at common law, which required a corroborating witness. I mean, you couldn't just take somebody to trial for perjury because of a he said, he said situation. So if we permit a regime where all you have to do is have the defendant testify at trial and be convicted and then generally the district court imposes this enhancement simply because there is an inference that that judge draws from the general verdict of the jury that, well, he must have lied. That's a pretty scary prospect, isn't it? That would be, but I don't think it is. And it would, certainly, if it's that considerable. That ease really would have the tendency to discourage a defendant from sentencing. I understand Judge Schwab made a comment about that. You know, that train left the station a long time ago. The Supreme Court's made clear that that policy reason just won't count here. But if we allow a court to generally impose something without stating reasons, don't you find that highly problematic in the setting that I've just described? I do, and courts after Dunnegan have found it problematic, and that's why every chance they get they say the court. I don't know that any have said it absolutely in all cases must make findings, but they've said it should. I'm not sure this court has always required real specific findings in reviewing the record from the district court. Your Honor, that is a scary kind of standard, but the thing to remember is Dunnegan tempers it by saying, well, it's not just false testimony. It has to be material. It has to not be by accident. And whatever parameters we give for the standard here, I mean, this guy takes the stand and says, I wasn't a drug dealer and my girlfriend was. That's clearly on purpose, and it's clearly material. I did want to ask just one question to follow up. It's similar to what you were asked about, the 2D1 enhancement. Is the government requesting us to remand for findings, or are you asking us to reverse and make findings? So here's my answer to that. If you agree with me that the district court didn't make findings, so let's say the judge's statement, I don't know that the record supports it. If you don't think that satisfies whatever obligation the court may have to articulate findings, then yes, I think, again, in fairness to the defendant, let's remand on that issue. Let the district court decide in the first instance. If you think that is a tacit finding, then you match it up to the Dunnegan factors and you ask, well, is this clearly erroneous in light of the evidence that the testimony is false and material and deliberate? And just to be clear with respect to this case, not the case where the enhancement has been applied, but this case where the district court opted not to apply it, irrespective of all the cases out there or what other courts have required, this court can do whatever they want in that regard. Can we not? We can decide we want a supervisory rule, because for purposes of appellate review, we want the reasons state. You could, and I think that's consistent with what the court's already said, for example, you know, the post-Booker world. Thank you. We'll head back on the bubble. Ms. Petropavlov. Good morning, Your Honors. My name is Petropavlov for the appellate cross at L.E. Raymond McAllerton. I think that the biggest question in this case with respect to the 2D1.1 is what's the correct appellate standard of review, and that, of course, is clear air. What about the district court apply the proper standard? I mean, nowhere did the district court articulate the clearly improbable standard. The government, well, both parties actually filed a briefing on the sentencing issues in the course of the argument and sentencing. The guideline itself was read. The government said we have the burden on this guideline, and they recite the guideline with the clearly improbable language. Then they proceed to argue the Dredowski factors, and the court says, I've listened to the evidence. I've decided that the 2D1.1 enhancement doesn't apply. I don't believe the court's required to say that it's not clearly improbable that the guns were possessed in connection with the guns. That's the test, isn't it? That's the test, but he states, I don't believe the guideline applies. And I think implicit in that is reading the language of the guideline, and that was already done, and that's on the record. And what he did was, however you choose to allocate the burden of proof, what he did was look at the evidence that was presented, and he determined that the enhancement didn't apply, and the factors that he looked at were not clearly erroneous. What about the fact that he paid no attention apparently, because there's absolutely no reference, to a number of the guns that were there and recovered and in evidence? That's not exactly what happened. He was, the government's focus, reading the record, the government focused on the browning on the mantle, and it alluded to the other guns, and how it said it was. Well, let's stop right there. It focused and it alluded. So it was all on the record before Judge Schwab. Yes, it's all on the record. The government's focus was on the guns. And did he make reference to other guns? He did. And his reference, and the court's completely right, what he said was, you know, your focus is on the 2D, I'm sorry, on the browning, and he talked about the browning. And then he refers back to his earlier ruling, and in the earlier ruling is when he really hit the other firearms that were at issue. And what he said was, he looked at the type of, you know, he set forth the Dredowski factors. He looked at the type of the weapon, type of guns, and the connection, the type of weapons and where they were stored. And he stated that the type of weapon that he focused on at that point was, based on his experience in two trials he had had in recent years, was not the type of gun that would have been used by a drug dealer. I read the sentencing transcript in its entirety, but that's my recollection, effectively what he said, almost a quote. Yeah, I think he referred to all the guns collectively when he made that comment. I agree with that. Okay, fair enough, if that's what he said. The expert testimony, the expert was asked. Was that a sufficient basis for this court to be willing to credit his finding, that experience, that level of experience? That wasn't the only thing he said. I understand it wasn't. I'm asking you specifically about this discrete reason. If that were the only thing, that's really not evidence that's in the record, so I'm not sure that this court could affirm on that basis. But that wasn't the only thing. That statement was more a kind of an agreement of what the expert testimony was. The expert said, typically drug dealers use unlawful guns, guns that are not registered, guns that are stolen, not hunting rifles. What was on the mail? Not a hunting rifle. It was not. It was a Browning .32. There was no evidence that that gun was stored on the mantle. The evidence was from Lisa Rademeyer. She indicated that she'd seen the gun in her seven years living in the house numerous times, in the bedroom, in the nightstand, on the dresser, and she added on the mantle. So there was no evidence that it was habitually stored there. Do you take issue at all with Mr. Cook's description of the physical layout of the residence and the location of the gun on the mantle vis-à-vis the safe and the items in it and on it? The evidence showed that the government presented evidence that the door to the office was usually locked. The mantle's in the living room and you have to go down the hall, they said, again, and it is a small house so it is steps to the office. In the office there's a closet. Inside the closet is the gun safe where the guns were kept. It is important to note that they were primarily shotguns, hunting shotguns and rifles, and there were three unloaded small caliber handguns, and there was no ammunition for those three small caliber handguns anywhere in the house. So I think that's also a significant factor in the judge's thinking. You made a comment about... I'm sorry. Go ahead. Did the district judge make any findings with respect to the absence of ammunition for the handguns? I think the absence of that evidence plays into whether his findings are clearly erroneous or not clearly erroneous. The .32 was loaded. It was loaded, yes. What the government says is the clear error in this case is that the district court disregarded unremitted testimony that Napolitan carried the loaded Browning because he'd been robbed in the course of his drug dealing. He says that two or three times in the briefing. There's no testimony from anyone that he carried the gun because he'd been robbed in the course of his drug dealing. The testimony from Lisa was that they specifically asked her, why do you even have this gun? And she said, he told me he'd been robbed before. If this robber predated her knowing him, it had to have been more than seven years previously. In fact, the critical part of this was, there was no testimony of any dealing whatsoever taking place from this house. Any drug transactions ever taking place from this house. One of the Joradsky factors is you look at the type of drug offense that's involved. And here we have a constructive possession of a distribution amount of cocaine found in this safe. And $9,000. $9,000. From a man who worked full time making $77,000 a year who worked overtime. This is a man with no prior criminal record. Where did the money come from? It was never evidence that it was drug proceeds. It's money and it's with drugs. That's why the assumption is that it's drug proceeds. But in terms of what the clear... I'm sorry. It's okay. If I could just ask... I'm sorry. That's quite all right. You mentioned that there were submissions made to the district court about the enhancement, the 2D1.1 enhancement. My question is whether or not the defendant took the view that the defendant bore the responsibility in producing evidence to show the exception to the enhancement applied. That clearly improbable part. If that's what you guys did in district court. The burden was never added to the district court. I think frankly nobody... Right. Right. But Judge Schwartz is asking you now. Yes. And the questions that Ms. Kokas have gone to. What should the evidentiary burden and production regime be here? Clearly everybody agrees the burden is on the government to make that a case for the enhancement. But what we have is effectively an exception. Now who ought to have the burden of production with respect to that? I think practically the way this should work is the government bears the burden, always bears the burden, an unshifting burden of proving that the defendant possessed a weapon and that there's a connection. Then the defendant bears the burden of production to come forward with an alternate explanation. So it sounds like everyone's in agreement on that or that both sides are in agreement on that? On the way I've stated it. That's fair to the government because the defendant, you know, we always put the burden on the party who has the access to the evidence. And then the court has to ask the ultimate question of whether the defendant... If I could just say, even if this court, standing here today, weighed the evidence differently and say gun and same house as drugs, that's not enough to meet the clear error test. If there's two permissible views of the evidence, the fact finder's choice between them can never be clear error. But if the district court applied the wrong legal standard, that is, made erroneous reference to language or used language that has no basis within the text of the enhancement guideline itself, we have to send this back, don't we? I didn't see in the record where he made erroneous... All right, we went over that during the questions to Mr. Kokos. And the failure would be clearly improbable in the use of the word certainly. But let's move on to the perjury enhancement in the time that you have left. I assume that you would agree that we can't simply refuse to impose the enhancement based on a belief that its imposition would chill the defendant's right to testify, which was an alternative suggestion that the sentencing judge here made in his statement when he declined to impose the enhancement. I assume you'd agree with that. You can't base it on a fear of declining, exactly. The court said... So why isn't the primary reason that the sentencing judge announced here, and that is, I don't know that the record supports it. Should that be enough for us to uphold it? The court said based on the record, it's clear the jury was... I'm sorry, I'm looking at the wrong quote here. What the court said was, I've heard all the evidence and I don't think it supports perjury. And it's interesting... We said, I don't know that the record supports it. That's what I'm referring to at the appendix page 466. Right. And what the judge said, in terms of what he's required to find, the fact-finding, if he were to go that way. First, let me say there is no circuit split, but I've talked about that in my briefing. Even if he's required to make facts, in Dunnegan, what the court found was, this is the case where they talk about applying the enhancement and what the court has to say. He said, I find the defendant is untruthful at trial with respect to material matters, that affect the outcome, and I give the two levels. Here, the court said, I've been presented with evidence of the defendant's purported obstruction. After hearing all the evidence, I found he did not obstruct, as that term was defined in the guidelines and in phrase, and I declined to apply the two-level enhancement requested by the government. That's at appendix 481. Phrase then goes on to define the three requirements of perjury, which are false testimony concerning the material matter with willful intent. So I submit that to the extent findings are required, that they were in fact made consistent with the findings that were actually made in Dunnegan. The court's determination with respect to the 2C1.1 enhancement and with respect to the 3C1.1 enhancement was highly dependent on the credibility of the witnesses. The jury was free to find, and they did find, that the defendant was responsible. The judge was free to find that he didn't accept that the defendant was responsible. We know that that was his leaning because he said several times that the court had had in the course of the proceedings at trial and sentencing reason to question Lisa's testimony. She's the key and only fact witness against Mr. Rademeyer, and he said that's the jury's determination, not mine. He was free to find in the 2D1.1 context that Mr. Napolitan was not the one responsible for drug trafficking, and if that's the case, then his determination that there's no clear connection, that the connection between the guns and the drugs is clearly improbable, cannot be reversed for clear error. This court has said, particularly when we're dealing with the credibility determination, if the testimony is coherent and plausible, not internally inconsistent and not contradicted by external evidence, there can almost never be a finding of clear error. That was a key basis for the court's ruling on both the 3C1.1 perjury enhancement and the 2D1.1. And where was this finding by the district court judge that he found Ms. Rademeyer not credible? Is that something he makes at sentencing? Yes. At the second, at the sentencing hearing after she testified about that she had forgotten about the second key? He says it twice. He says it in the course of his Rule 29 motion. He says the jury heard evidence that would have caused them to question her credibility. But he lets the case go to the jury, obviously. He has to, yes, because it's a credibility determination, and that's the Rule 29 standard. At sentencing, he says immediately preceding his discussion of the reasons why he's not giving the perjury enhancement, he says, I've had reason to question her credibility in the course of trial and in the course of sentencing. And then he goes on to say, and this defendant is in a unique situation. He has no record. He's never been arrested for any kind of drug offense. And yet he's found to be by the jury responsible for this large amount of cocaine. And he says, but that's the jury's determination, and it's not my place. Remind us, if you will, what the specific perjurious statements of the defendant were upon which the government relied in its request for enhancement. And you're asking in the district court. Is that correct, Your Honor? He relied in the district court on several. What did the government request as a basis for the obstruction enhancement, specifically suggestions of perjurious statements by Mr. Napolitan? The government said Mr. Napolitan lied at trial when he said Lisa called the safe company and ordered her own key going to show who had access to the safe. They said they would put Lisa on the stand to say she never asked for a key. When it came time to sentencing, she testified, oh, I called the safe company and ordered my own key and got my own key. They said Mr. Napolitan lied when he said there were several keys in the house and in the safe. At trial, the officer testified there was one key found in the safe and only in the safe. At sentencing, it was determined that, in fact, there were two, at least two keys found within the safe. So the officer's testimony at trial was incorrect in that regard. Thank you very much. Thank you. Mr. Kokos, rebuttal. Mr. Kokos, in criminal trials, including criminal trials where the inquiry boils down generally to nothing more than credibility, we allow juries to come in with general verdicts. We don't seek specific findings in criminal trials sent out, written interrogatories. Why isn't, in this case, the kind of general determination made by Judge Schwab? I just don't think the record supports it enough. You're right. Because, Your Honor, under the Moskowitz decision, he has to accept the implications of the verdict. One of the grounds we argue for this enhancement was that Napolitan had lied generally at trial about his knowledge of these drugs. He did this at pages 202 to 205. Clearly, the jury had to have rejected that to have convicted him. Lying generally, though, shouldn't be the basis for a request for enhancement, should it? I'm sorry, should it? Lying generally should not be the basis for the government coming in and asking for an obstruction enhancement, should it? Unless it's material and it's deliberate, then it should. And that's the standard. This isn't me. This is the standard Dunnigan articulates. And that's why the enhancement is quite often applied by district courts. When a defendant takes a stand in his own defense and lies about, you know, if he's accused of having a gun, and he lies about having a gun and the jury convicts him of that, you know, it's material. In this case, we know it's deliberate because he made up this fiction about Lisa Rodemeier being the real drug dealer. I do want to correct one thing that Patricia Paula said. She keeps saying there's no evidence of drug dealing inside the house, and that just isn't the case. At page 71, Lisa Rodemeier testifies, and we get the benefit of all reasonable inferences from this, that whenever friends would come over, Napolitan would send her to a back bedroom with his son and tell her to stay there until he came out. She also testified about phone calls where gallons of paint were discussed. Correct. And then on top of that, and to me this is the censure at page, I think, 204 or 205, one of those, Napolitan himself took the stand, and he conceded he thought drug dealing was going on inside the house. He just denied he was the one doing it. So it's not as though there's no evidence of drug dealing, even if you ignored all the packaging, paraphernalia, and everything else. Let me take you back to the obstruction enhancement and remind me, because I actually have forgotten, what was the government's proffer to the sentencing judge, or what were the allegations by the government of specific perjurious statements made by the defendant? I think it was the two that Mr. Tripoli mentioned, but also, I mean, there's this third overarching, what I call the big lie, I think, in my reply brief, that he said he doesn't know anything about these drugs, and yet he's convicted. So that to me is not just material, there's no way to convict him. That's what the underlying case is all about. That's what the underlying case is all about. And if I could say one more thing, and I know this isn't really an issue in the appeal, but the recusal issue, I just want the court to know, I don't mean to be taking a shot at the district judge here, I'm usually in the business of arguing for his affirmance, and so I know he's hardworking and intelligent and everything else, but this recusal issue arises during the pendency on this appeal, and there's no explanation why. It was changed at the end. It was changed at the end while we were waiting to file our briefs here, so I don't know why. So, you know, I'm not speculating like the FPD is that it has anything to do with his standing order, but if it does, I could see Mr. Tripoli. The standing order relative to the Federal Public Defender's Office. Right. And it's possible it has something to do with that, but I don't know because he didn't say, and I just don't know where that leaves us if we show up in front of Judge Wernick and now Mr. Napolitan has a conflict with the FPD or he has private counsel. I'm just trying to preserve issues to make the SG happy. All right. Thank you very much. All right. Thank you very much, counsel. It was an interesting case. It was well-argued. We thank you very much. Thank you.